UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-00030-RJC-DSC

HIND BOUABID,                          )
                                       )
            Plaintiff,                 )
                                       )
       v.                              )
                                       )            ORDER
CHARLOTTE MECKLENBURG SCHOOLS          )
BOARD OF EDUCATION,                    )
                                       )
                                       )
            Defendant.                 )
_____)

**THIS MATTER** comes before the Court on the Parties' Cross-Motions for Summary Judgment. (DE 46, 48). These matters have been fully briefed, and on December 3, 2021, the Court conducted a hearing where it heard oral arguments from the Parties. The Court has reviewed the pleadings, motions, exhibits thereto, and applicable law and has considered the Parties' briefed and oral arguments. For the reasons stated herein, Defendant's Motion for Summary Judgment, (DE 48), is **GRANTED** and Plaintiff's Motion for Summary Judgment, (DE 46), is **DENIED**.

I.     **BACKGROUND**

       A.     **Procedural Background**

       On October 2, 2017, Plaintiff Hind Bouabid filed a due process petition ("Petition") under the Individuals with Disabilities Act ("IDEA") with the State Office of Administrative Hearings ("OAH") on behalf of her minor child A.C., alleging denial of a free appropriate public education ("FAPE") regarding A.C.'s individual education program ("IEP"). Plaintiff's Petition requested either private school placement or placement in a regular public high school and compensatory special education and related services for her disabled child A.C. In the Petition, Plaintiff challenged A.C.'s IEPs for the 2016-2017 and 2017-2018 school years based on seven issues. The

seven issues[1] were whether Defendant Charlotte-Mecklenburg Schools Board of Education ("CMS") denied A.C. a FAPE by:

1) failing to place A.C. in the least restrictive environment (for the 2017-2018 school year);

2) placing A.C. in a separate school (for the 2017-2018 school year);

3) failing to develop and implement appropriate behavior interventions (during the 2016-2017 and 2017-2018 school years);

4) failing to develop appropriate IEPs (during the 2016-2017 school year);

5) failing to provide appropriate related services (during the 2016-2017 school year);

6) failing to allow Plaintiff to meaningfully participate in all IEP meetings and predetermining placement on June 1, 2017; and

7) refusing to provide Plaintiff with Independent Education Evaluations ("IEEs") upon her request and failing to file for a due process hearing to show that its evaluations were appropriate.

(DE 42-8 at 465–66).

An Administrative Law Judge ("ALJ") heard the Petition and, after a multi-day hearing, the ALJ found in favor of Plaintiff on issues one and two in a written decision dated June 8, 2018. (DE 47 at 1–2; DE 49 at 1–2).  In particular, the ALJ found that CMS failed to provide A.C. a FAPE as her IEPs had no requirements for establishing periodic reviews or a change in behavior that would trigger a reevaluation to determine if A.C. could transition from a special education school back to a normal school.  (DE 42-8 at 470).

---

[1] As the ALJ ruled for Plaintiff on issues one and two, both of which focused on whether the move to Metro School was the least restrictive environment, and Plaintiff is not appealing that portion of the decision, the issue of least restrictive environment is not at issue in this appeal.

On July 9, 2019, Plaintiff appealed the ALJ's decision. The State Review Officer ("SRO") found the appeal untimely and did not issue an opinion on the merits. Exhausting her administrative remedies, Plaintiff then filed a Complaint in the instant case for damages on January 21, 2019. (DE 1). On March 6, 2020, this Court found Plaintiff's appeal to the SRO timely and overturned the SRO's decision. (DE 26). In the same order, this Court granted in part and denied in part Defendant CMS' Motion to Dismiss. The sole remaining claim that survived the Motion to Dismiss, and which is the basis for the cross-motions on summary judgment, is the appeal of the ALJ's decision. Plaintiff attacks the ALJ's decision on seven grounds, which the Parties address in the cross-motions. The seven grounds include:

1) whether the ALJ's decision was regularly made and entitled to deference;

2) whether the claims that occurred prior to the statute of limitations should have been excluded from Plaintiff's Petition;

3) whether CMS developed appropriate IEPs during the 2016-2017 school year;

4) whether CMS developed and implemented appropriate behavior interventions during the 2016-2017 and 2017-2018 school years;

5) whether CMS provided Plaintiff the opportunity for meaningful participation in all IEP meetings and did not predetermine A.C.'s placement;

6) whether Plaintiff's request for independent education evaluations fell outside the statute of limitations; and

7) whether CMS provided appropriate related services.

**B.    Factual Background**

Plaintiff Hind Bouabid brought the instant case on behalf of her minor child A.C. A.C. is a student enrolled in the Charlotte-Mecklenburg school district. Defendant CMS is a local education agency receiving federal funds under the IDEA. At the time the underlying Petition was

3

filed, A.C. was a fifteen-year-old student in 10th grade attending Metro School, a public school run by CMS for children with cognitive disabilities. (DE 49 at 2–3; DE 47 at 3).

A.C. is diagnosed with severe autism and has been receiving special education services under the IDEA and North Carolina laws and policies since she was in pre-kindergarten. A.C. has a number of impairments associated with her disability including difficulties with verbal language, intellectual delays inhibiting learning, and behavioral issues. (DE 49 at 3).

During the 2016-2017 school year, A.C. was a freshman in 9th grade and attended Mallard Creek High School, a public high school with special education programs. A.C. began the year with an informal classroom behavior plan which included an informal data collection process. Throughout her freshman year, A.C.'s IEP team met approximately five or six times to discuss her IEP. The IEP team engaged the special education department for additional support and assistance with A.C. because behavior interventions had an inconsistent effect.

On December 13, 2016, the IEP team conducted an annual review and updated A.C.'s IEP to include a formal behavior intervention plan ("BIP") to prevent aggressive behaviors.[2] The BIP included specific interventions tailored to A.C. and were used in the classroom. (DE 42-3 at 199:23–205:23; DE 42-9 at 353–54). A.C. required adult supervision at all times in the classroom and she failed to regularly complete tasks without assistance. CMS collected over 200 pages of data throughout the year on the frequency and intensity of A.C.'s behaviors to help determine which behavior interventions were most productive. This data guided the IEP team in developing A.C.'s goals. (DE 45; DE 49 3–4, 18; DE 50 at 3). During the December meeting, the IEP team also opened a reevaluation process to conduct behavior evaluations. (DE 42-7 at 485). On

---

[2] The aggressive behaviors included pulling hair and clothing of others, throwing classroom items, spitting, yelling, laughing, biting, etc. (DE 42-3 at 199:23–200:3).

February 21, 2017, the IEP team modified A.C.'s BIP to address a new behavior—escaping or avoiding tasks. However, because A.C. was on a new medication at the time, the IEP team decided not to alter the interventions. The IEP team reviewed the modified BIP at an April 25, 2017 IEP team meeting.

In addition to the aforementioned behavioral issues, A.C. also has other behavioral issues including inappropriately touching others, picking up objects, and echolalia—the meaningless repetition of another person's spoken words as a symptom of psychiatric disorder. While at school, A.C. participated in assemblies and lunch in the general education setting with accommodations but rarely, if ever, participated in any activities with non-disabled peers. (DE 49 at 4–5; DE 47 at 4–5).

On June 1, 2017, the IEP team reviewed A.C.'s IEP goals and objectives and determined they were current and appropriate. The team noted that A.C. was capable of making progress on her current IEP but her behaviors impeded her academic improvement. Caroline Overcash—a program specialist and expert in special education and autism—worked at CMS and was familiar with A.C. She testified that after exhausting all appropriate research-based behavioral interventions, and having no consistent success, the IEP team decided to change A.C.'s placement to Metro School so that A.C. could get more specialized care. (42-4 at 146; DE 42-5 at 22). Plaintiff opposed the move and, as Plaintiff was part of the IEP team, the IEP team decision to move A.C. to Metro School was not unanimous. In response to the move, Plaintiff argues that CMS failed to exhaust every research-based intervention as the interventions were limited to the confines of a computer software program and there are thousands of interventions available. (DE 49 at 4–5; DE 50 at 5).

5

Plaintiff was invited to and attended every IEP meeting, either by phone or in person, and was allowed to bring individuals of her choosing to act as advocates at these meetings. Plaintiff's native language is Moroccan, and English is her fourth language. (DE 42-2 at 3). Witness testimony shows that CMS offered Plaintiff interpretation services at the IEP meetings, even though Plaintiff never made a request for an interpreter. Plaintiff refused these services.[3] (DE 42-4 at 142:17–21). During the meetings, Plaintiff expressed her opinions and concerns and was involved in the development of A.C.'s IEP. (DE 1 at ¶273; DE 49 at 6). At the multi-hour June meeting, Plaintiff discussed her concerns with the rest of the IEP team over moving A.C. to Metro School. (DE 42-9 at 441–45; 42-4 (Tr. Vol. VI) at 131:4–135:23; DE 42-4 (Tr. Vol. VII) at 193:21–24; DE 42-5 (Tr. Vol. VIII) at 144:18–145:11). While there was no consensus, it was ultimately decided that moving A.C. to Metro School was the least restrictive environment.

During A.C.'s 9th grade year, she was supposed to have eight speech sessions and four sessions of occupational therapy ("OT"), but A.C. did not receive any occupational therapy. (DE 47 at 5). A.C.'s IEP from August 2016 through January 2017 of her 9th grade year, which was created during A.C.'s 8th grade year, listed OT four times per year as a related service. (DE 42-7 at 461). CMS never provided OT services to A.C. during her 9th grade year. Before A.C.'s 9th grade year, at the January 2016 IEP meeting, the IEP team determined that OT services were no longer needed. (DE 42-5 (Tr. Vol. IX) at 18:18–20:24; 42-8 at 1). CMS relayed this information to Plaintiff in a written notice in January 2016 while A.C. was still in 8th grade. (DE 42-9 at 94–98). Witness testimony from CMS shows that it was human error why the OT services were not

---

[3] Plaintiff asserts in her summary judgment motion that she was never offered translation services, but provided no record cite supporting this contention. (DE 47 at 12). CMS' contention that translation services were provided is supported by record evidence. (DE 47 at 12; DE 42-4 (Tr. Vol. VII) at 142:17–21). Plaintiff failed to respond to CMS' supported allegation that CMS did offer a translator.

removed from A.C.'s IEP for her 9th grade year.  (DE 42-4 (Tr. Vol. VII) at 114:6–17, 117:13–22).  Regarding speech-language services, Plaintiff's speech pathology expert testified that A.C. could learn and was in need of direct speech-language therapy.  (DE 42-2 at 191).  However, A.C.'s IEP team determined that direct speech-related therapy was not necessary and classroom instruction was sufficient.  (DE 42-9 at 95).

In the fall of 2018, A.C. started 10th grade at Metro School against her mother's wishes. Plaintiff alleges she was never told by CMS that she had the ability to initiate a removal process for A.C. to exit Metro School.  (DE 47 at 5–6).  On August 15, 2017, after A.C. was placed at Metro School, Plaintiff requested IEEs in the areas of (1) behavioral, (2) psychological and educational, (3) occupational therapy, (4) speech language, and (5) autism.  (DE 42-8 at 107). There were no assessments in these areas within one year of the IEE request date as the previous evaluations in these areas were conducted between 2013 and 2015.  (DE 49 at 22–23).  On August 30, 2017, CMS denied Plaintiff's IEE requests and did not request a due process hearing.  (DE 42-8 at 112; DE 42-2 at 37).

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(A).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  *Id.*  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine

7

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

**B.     Individuals with Disabilities Act**

"The IDEA provides funds for states to educate children with disabilities, subject to conditions imposing substantive requirements on the education that is provided." *R.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019). "In return for the receipt of federal education funding, states are required by the IDEA to provide each of their disabled children with a FAPE." *M.M. v. Sch. Dist.*, 303 F.3d 523, 526 (4th Cir. 2002). "[A] FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient

8

'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748–49 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)).

"The mechanism by which a state provides a FAPE is an IEP—a document that describes the child's unique needs and the state's plan for meeting those needs." *R.F.*, 919 F.3d at 241. "The IEP is to be formulated by an IEP Team consisting of the child's parents, one of the student's regular teachers, a special education teacher, a representative of the school board, an individual who can interpret evaluation results and, whenever appropriate, the disabled child." *A.B. v. Lawson*, 354 F.3d 315, 319 (4th Cir. 2004). An IEP must contain a statement of the child's present levels of academic achievement and functional performance, measurable annual goals designed to meet the child's unique needs, a description of how the child's progress towards those goals will be measured, the special education and related services that will be provided to the child, and an explanation of the extent to which the child will participate with nondisabled children in the regular class. 20 U.S.C. § 1414(d)(1)(A)(i).

"Because parents and school representatives sometimes cannot agree on such issues, the IDEA establishes formal procedures for resolving disputes." *Fry*, 137 S. Ct. at 749. The IDEA allows states to choose between a one- or two-tiered system of administrative review. *G.L. v. Chapel Hill-Carrboro Bd. of Educ.*, 975 F. Supp. 2d 528, 531 (M.D.N.C. 2013). North Carolina provides a two-tiered administrative review process. *Id.* at 532; *see also* N.C. Gen. Stat. §§ 115C-109.6, -109.9. First, a party may file with the OAH a petition for a due process hearing regarding "any matter relating to the identification, evaluation, or educational placement of a child, or the provision of a [FAPE]." N.C. Gen. Stat. § 115C-109.6(a). The OAH appoints an ALJ to conduct the hearing, who then must issue a written decision containing findings of fact and conclusions of law. *Id.* § 115C-109.6(f). Second, a party may appeal the ALJ's decision to the SBE who appoints

9

an SRO to conduct an impartial review of the ALJ's findings. The SRO then issues an independent decision. *Id.* § 115C-109.9(a). A party must exhaust these administrative procedures before bringing an action under the IDEA in district court. 20 U.S.C. § 1415(l); *Fry*, 137 S. Ct. at 752.

Courts use a "modified de novo" standard when reviewing an administrative decision under the IDEA, where deference is given to findings of fact that were regularly made by the ALJ. *Kuszewski v. Chippewa Valley Sch.*, 131 F. Supp. 2d 926, 929 (E.D. Mich. 2001). A Court may set aside an ALJ's decision "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.* However, district courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

## III. DISCUSSION

### i. The ALJ's Decision

#### ii. Regularly Made and Entitled to Deference

"[I]n reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." *Doyle v. Arlington County School Bd.*, 953 F.2d 100, 103 (4th Cir. 1991) (citing *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). An ALJ's factual findings are presumed correct if "regularly made." *Id.* at 105. In the Fourth Circuit, "[w]hen determining whether a hearing officer's findings were 'regularly made,' our cases have typically focused on the *process* through which the findings were made." *J.P. v. County Sch. Bd,* 516 F.3d 254, 259 (4th Cir. 2008). Factual findings are "regularly made" when the hearing officer conducts "a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the

normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* "Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." *Id.* While factual findings that are regularly made are given deference, if an ALJ's determination is based on a misunderstanding of the law, misunderstanding of fact, and contains insufficient reasoning, it is entitled to little, if any, deference. *Combs v. Sch. Bd. of Rockingham Cnty.*, 15 F.3d 357, 361 (4th Cir. 1994); *Q.C-C. v. D.C.*, 164 F. Supp. 3d 35, 49 (D.D.C. 2016). No deference is accorded an IDEA administrative officer's conclusions of law as these are reviewed *de novo*. *E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ.*, 975 F. Supp. 2d 528, 537 (M.D.N.C. 2013); *Fitzgerald v. Fairfax Cty. Sch. Bd.*, 556 F. Supp. 2d 543, 558–59 (E.D. Va. 2008). Credibility determinations, whether explicit or implicit in an ALJ's decision, are entitled to the same deference on appeal. *County Sch. Bd. v. Z.P.*, 399 F.3d 298, 307 (4th Cir. 2005).

Plaintiff argues that deference should be given to the ALJ's findings of fact related to issues one and two, which Plaintiff prevailed on, but not to issues three through seven, which Plaintiff lost on. As support, Plaintiff argues the ALJ's decision lacked findings of fact or citations to the record for certain issues and listed specific facts that the ALJ failed to include. (DE 47 at 9). CMS argues that the ALJ's factual findings were regularly made and thus entitled to deference. (DE 51 at 1–2; DE 49 at 10–13).

Here, Plaintiff was allowed to file a summary judgment motion prior to a ten-day hearing before an impartial ALJ. Both Parties were allowed to make opening and closing arguments, present evidence, cross examine witnesses, and argue evidentiary issues. In fact, Plaintiff presented over thirty exhibits, put on nine witnesses, and cross-examined CMS' witnesses. (DE 49 at 11). After the hearing, the ALJ determined Plaintiff only met her burden in proving A.C.

had a right to relief under the IDEA for two of the seven issues. The ALJ's nine-page written decision shows the ALJ clearly understood the issues, gave "careful consideration of the sworn testimony of the witnesses presented at the hearing and the entire record," "weighed all the evidence," and "assessed the credibility of the witnesses." (DE 42-8 at 468).

This is not equivalent or even analogous to "flipping a coin" or "throwing a dart," and there are no facts showing that the fact-finding process was "far from the acceptable norm." *J.P.*, 516 F.3d at 259. Moreover, a lack of detail in the hearing officer's decision does not provide a basis for concluding the factual findings were not regularly made nor entitled to deference. *Id.* at 262–63 ("As the district court noted, only two of the factual findings made by the hearing officer addressed issues about which the parties disagreed, and those findings are about as bare-boned as they could be," but this "does not provide a basis for concluding that the factual findings contained in a statutorily compliant written opinion were not regularly made and therefore not entitled to deference."). As ALJ's "operate under tight time constraints [they] cannot be expected to craft opinions with the level of detail and analysis we expect from a district judge." *Id.* at 236. Accordingly, Plaintiff's argument that the factual findings are insufficient is unavailing as Plaintiff failed to show that the decision did not meet a standard set forth by statute or case law or that the process behind the findings was anything other than regularly made.

iii.  <u>Appropriate Remedy</u>

Plaintiff's claim that the ALJ delegated the relief for issues one and two in violation of the IDEA is also unavailing. Under the IDEA, an ALJ may not delegate his or her authority to an IEP team "to determine the remedy for [a FAPE] violation." *M.S. v. Utah Sch. for the Deaf & Blind*, 822 F.3d 1128, 1136 (10th Cir. 2016); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 526 (D.C. Cir. 2005).

12

Here, the ALJ, in finding for Plaintiff on issues one and two, determined that CMS deprived A.C. of a FAPE because there was nothing in A.C.'s IEP setting forth "what must occur for a change to a less restrictive environment than a separate school." (DE 42-8 at 470). To remedy this, the ALJ ordered CMS to revise A.C.'s IEP "to include benchmark(s) and criteria" that trigger an evaluation on whether A.C. could return to her previous school. (*Id.* at 472). The ALJ did not delegate her responsibility to fashion this remedy. Rather, the ALJ determined the appropriate remedy was the addition of criteria triggering an evaluation in A.C.'s IEP and ordered the IEP team, as they are the most knowledgeable regarding A.C.'s disability, to determine the criteria.

Other courts have upheld similar decisions by ALJ's who fashion relief that requires the IEP team to implement. *See Struble v. Fallbrook Union High Sch. Dist.*, No. 07-cv-2328, 2011 U.S. Dist. LEXIS 7866, *7–8 (S.D. Cal. Jan. 27, 2011) (upholding an order by a hearing officer for the parties to develop a new IEP that would permit the student to work toward a diploma because the order "did not give the IEP team authority to change or reduce the remedy in any way"); *A.L. ex rel. L.L. v. Chi. Pub. Sch. Dist. No. 299*, No. 10-C-494, 2011 U.S. Dist. LEXIS 133124, *9 (N.D. Ill. Nov. 18, 2011) (upholding an order directing "the IEP team to develop an IEP that includes reading instruction presented through a multisensory approach") (quotation and alteration omitted). Thus, the ALJ here did not improperly delegate her authority.

### C. Motion in Limine Excluding Claims Outside the Statute of Limitations

The ALJ granted CMS' Motion in Limine excluding Plaintiff's allegations from before October 1, 2016 as being outside the statute of limitations. North Carolina has a one-year statute of limitations for filing any denial of a FAPE claim under the IDEA. N.C. Gen. Stat. § 115C-109.6(b). For an alleged violation, the petition must be filed "not more than one year before the party knew or reasonably should have known about the alleged action that forms the basis of the petition." *Id.* The only exceptions to the statute of limitations are "if the parent was prevented

from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the petition, or (ii) the local educational agency's withholding of information from the parent that was required under State or federal law to be provided to the parent." N.C. Gen. Stat. § 115C-109.6(c).

Plaintiff suggests that because Plaintiff is from Morocco and her native language is not English, coupled with her lack of special education law training, she never "knew or reasonably should have known" of the alleged violations. (DE 47 at 11). CMS argues that Plaintiff failed to present facts showing any exception to the statute of limitations and that Plaintiff disavowed any allegations from before October 2016 at the OAH hearing before the ALJ. (DE 49 at 14).

Plaintiff attended all IEP team meetings, often bringing an advocate, and participated in these meetings. Plaintiff's argument that the statute of limitations should be tolled because Plaintiff's lack of special education law training and language difficulties prevented her from knowing or reasonably knowing of violations is unpersuasive. Plaintiff was able to understand A.C.'s disability and effectively communicated her desire to keep A.C. at Mallard Creek High School. Plaintiff also brought advocates to the IEP meetings on her behalf. Moreover, Plaintiff cites to no legal support that special legal training is required to trigger the "known or reasonably should have known" standard. Regardless, at the hearing before the ALJ, Plaintiff disavowed any claims that occurred before the statute of limitations, thus waiving any such claims in this appeal.[4]

---

[4] During the hearing before the ALJ, Plaintiff disavowed on record any claims preceding October 2016, stating to the ALJ:

> We don't have any causes of action or claims that do not fall within the one year period of time. So we have not – there maybe potential claims that occurred outside of the one year period or potential claims that occurred beyond October 2, 2017, but that's not part of our petition. We didn't bring any claims that occurred prior to October 1, 2016 and after October 2, 2017.

(DE 42-1, Tr. Vol. I at 12:10-18).

Accordingly, the ALJ's decision to grant CMS' Motion in Limine excluding claims from before October 2016 was proper.

### D. Appropriateness of IEPs during the 2016-2017 School Year

"The mechanism by which a state provides a FAPE is an IEP—a document that describes the child's unique needs and the state's plan for meeting those needs." *R.F.*, 919 F.3d at 241. An IEP must contain a statement of the child's present levels of academic achievement and functional performance, measurable annual goals designed to meet the child's unique needs, a description of how the child's progress towards those goals will be measured, the special education and related services that will be provided to the child, and an explanation of the extent to which the child will participate with nondisabled children in the regular class. 20 U.S.C. § 1414(d)(1)(A)(i); NC 1503-4.1(a). Importantly, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Id.*

IEP goals are adequate when they are specific, capable of measurement, and directly relate to the student's focus areas as identified in the student's present levels of performance. The description of annual goals is sufficient when it allows the district to determine whether the student made progress and makes clear which specific skills will be required to achieve those goals. *See* 64 Fed. Reg. 12,471 (1999); *see Kuszewski v. Chippewa Valley Schs.*, 131 F. Supp. 2d 926 (E.D. Mich. 2001), *aff'd*, 56 Fed. Appx. 655 (6th Cir. 2003) (goals must be objectively measurable). An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

Plaintiff argues that the IEPs were inappropriate because they failed to include a standard that would trigger evaluations for moving A.C. back to her previous high school; that CMS failed

15

to provide measurable and appropriate goals because A.C.'s IEP goals carried over from previous years and A.C. ultimately was sent to a more specialized school; and that Plaintiff's witnesses testified that the IEP goals were not measurable or appropriate for A.C. (DE 47 at 22–25). Defendant claims the IEP goals were measurable and specifically tailored to A.C. and that it was within the ALJ's discretion to make credibility determinations of witnesses when determining whether the IEPs were reasonably calculated to enable A.C. to make progress in light of her circumstances. (DE 49 at 14–16).

Plaintiff's main argument, that the IEPs were inappropriate because they failed to include a standard setting forth how A.C. could move back to her previous high school is unconvincing. Plaintiff's posits that the IEPs for the 2016-2017 school year are inappropriate. However, A.C. did not move from Mallard Creek High School to the specialized Metro School until the 2017-2018 school year. As A.C. had not yet been moved to Metro School during the 2016-2017 school year, there was no need for the IEPs for that school year to address a standard setting forth how A.C. could move back to Mallard Creek High School from Metro School. Regardless, the ALJ already ruled in favor of Plaintiff on issues one and two—that the IEPs for the 2017-2018 school year failed to set forth a standard explaining how A.C. could return to Mallard Creek, thus denying A.C. a FAPE. Plaintiff's reiteration of this argument is duplicative in light of the relief the ALJ already afforded A.C. on the issue of whether Metro School was the least restrictive environment for the 2017-2018 school year.

Plaintiff also argues that the IEP goals were not measurable or appropriate because they carried over from previous years and because A.C. ultimately was sent to a specialized school. While some goals may have been similar, which makes sense as A.C. had difficulties learning, they were revised based on A.C.'s needs. For example, the annual goals and short-term

16

benchmarks and objectives in the August 18, 2016 IEP were updated and revised in the December 15, 2016 IEP. (*Compare* DE 42-7 at 449–56 *with* 42-9 at 324–30). This shows that, at a minimum, A.C.'s IEP team was updating the IEP goals to attempt to tailor them to A.C. The fact that A.C. was later sent to Metro School so that she could receive additional support does not negate this. Nor is the IEP standard outcome dependent or subject to hindsight review. Additionally, it was the ALJ's duty to make creditability determinations between witnesses for Plaintiff and Defendant, and Plaintiff has failed to show the ALJ's credibility determinations were not regularly made.

### E. Appropriateness of Behavior Interventions during the 2016-2017 and 2017-2018 School Years

There are two situations where a BIP may be warranted. *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 614 (7th Cir. 2004). The first situation is when a disabled student is subject to disciplinary measures because of a behavior that is a manifestation of the student's disability. *Id.* When this is true, the IEP team must conduct a functional behavioral assessment and implement the findings into a behavioral intervention plan ("BIP") or, if a BIP already exists, review and modify it as necessary to address the behavior. 34 C.F.R. § 300.530(f). The second situation occurs when a disabled student's behavior impedes the learning of himself or others. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i). In such cases, the IEP team should consider a BIP with positive behavioral interventions. *Id.* There are no specific substantive requirements for a BIP under the IDEA. *Alex R.*, 375 F.3d at 615. However, as part of the IEP plan, to meet the FAPE standard a BIP should be reasonably tailored to meet the needs of the student while being appropriately ambitious in light of the student's circumstances. *Endrew*, 137 S. Ct. at 999–1000. A school's failure to develop a BIP can result in denial of FAPE. *Neosho R V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003); *Enter. City*

*Bd. of Educ. v. S.S.*, No. 1:19-CV-748, 2020 U.S. Dist. LEXIS 103536, at *18–19 (M.D. Ala. June 12, 2020).

Here, Plaintiff began the 2016-2017 school year with an informal classroom behavior plan. On December 13, 2016, halfway through the year, the IEP team developed a formal BIP to address A.C.'s aggressive behaviors. There is no record evidence that A.C. was subject to disciplinary measures so the Court assumes the IEP team developed the BIP because A.C.'s aggressive behaviors, which included pulling hair and clothing of others, throwing classroom items, spitting, yelling, laughing, and biting, were impeding A.C.'s and the other student's ability to learn. Regardless, the BIP included specific behaviors and intervention strategies to prevent the aggressive behaviors and reward positive behavior. Witnesses observed these interventions take place in the classroom. CMS collected 200 pages of weekly data throughout the year on the frequency and intensity of A.C.'s behaviors to help determine which behavior interventions were most productive. (DE 45). This data guided the IEP team in developing A.C.'s goals. On February 21, 2017, the IEP team modified A.C.'s BIP to address A.C.'s new behavior of escaping or avoiding tasks. However, because A.C. was on a new medication at the time, the IEP team decided not to alter the interventions.

Plaintiff argues the BIPs were not appropriate because the IEP team failed to develop a formal BIP before A.C. entered high school; the data collected was inaccurate and uninformative; and the BIP was ineffective as A.C.'s behavioral issues continued and were used as part of the justification for moving A.C. to Metro School. (DE 47 at 18). Plaintiff also cites to *R.E.*, *Enterprise City*, and *Neosho* as analogous cases that support its position. CMS argues that the BIPs were reasonably tailored to meet the needs of A.C.; the IEP team exhausted research-based

interventions appropriate for A.C. before sending her to Metro School; and the case law cited by Plaintiff is incongruous with the present case.

The argument that CMS failed to develop a formal BIP prior to A.C. starting high school is outside the one-year statute of limitations, and Plaintiff's blanket assertion that the 200 pages of weekly data collected was inaccurate or uninformative lacks any specificity. Plaintiff's additional argument that the BIP was ineffective because A.C.'s behavioral issues ultimately were not fixed lacks legal support. While there are no specific substantive requirements for a BIP, the standard is whether the BIP was reasonably tailored to meet the needs of the student while being appropriately ambitious in light of the student's circumstances. It is not whether the BIP ultimately is successful in positively changing the student's behavior. CMS produced witness testimony and extensive record evidence of behavioral interventions that were implemented by A.C.'s teachers. The ALJ found this evidence credible and persuasive, ruling against Plaintiff. This Court finds no reason to overturn the ALJ's findings, nor does Plaintiff's cited case law change the Court's calculus.

The court in *R.E.* noted that the "failure to conduct an adequate FBA [functional behavioral assessment] is a serious procedural violation" that may "rise to the level of a denial of a FAPE." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). In *Enterprise City*, the court found the school district denied a student a FAPE when it failed to consider behavior interventions or develop a BIP. *Enter. City Bd. of Educ. v. S.S.*, No. 1:19-CV-748, 2020 U.S. Dist. LEXIS 103536, at *18–19 (M.D. Ala. June 12, 2020). Likewise, in *Neosho*, a behavior plan was never adopted by the student's IEP team, in spite of the fact the student's behavior problem was the major concern at every IEP meeting. *Neosho R V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028 (8th

19

Cir. 2003).  The undisputed facts here show that A.C. had a BIP in place to address her behavioral issues, delineating the instant case from the cited caselaw.

Accordingly, this Court affirms the ALJ's decision finding the behavior interventions for the 2016-2017 and 2017-2018 school years was proper.

**F.  Parental Participation in IEP Team Meetings and Predetermination of Placement**

**1.  Parental Participation**

The core of the IDEA is the "cooperative process that it establishes between parents and schools." *Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  "[P]arental participation is an important means of ensuring state compliance with the Act." *Hall by Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 634 (4th Cir. 1985).  "Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001).  A procedural violation that "causes interference with the parents' ability to participate in the development of their child's IEP will often actually interfere with the provision of a FAPE to that child." *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cnty.*, 309 F.3d 184, 191 (4th Cir. 2002).

A parent's right to participate in an IEP meeting for their child extends to the "identification, evaluation, and educational placement of the child." NC 1504-1.2(b)(1)(i).  It is the school district's responsibility to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate." NC 1503-4.3(a)(1)-(2).  A parent has meaningfully participated in the development of an IEP when she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions to the IEP. *N.L. v. Knox Co. Schs.*, 315 F.3d 688, 693 (6th Cir. 2003).  Failure to provide appropriate translation

services to a parent that cannot understand English can be grounds for lack of meaningful parental participation. *Marple Newtown Sch. Dist. v. Rafael N.*, No. 07-0558, 2007 U.S. Dist. LEXIS 62494, at *10 (E.D. Pa. Aug. 23, 2007).

Plaintiff argues that she was not afforded an opportunity to meaningfully participate in the IEP process because CMS did not conduct the IEP process in her native language or provide an interpreter. CMS argues that it offered an interpreter and that Plaintiff meaningfully participated in the IEP process.

Plaintiff's native language is Moroccan, and English is her fourth language. Witness testimony shows CMS offered Plaintiff interpretation services at the IEP meetings, even though Plaintiff never made a request for an interpreter. However, Plaintiff refused. Nonetheless, Plaintiff attended all IEP team meetings, either in person or by phone and was an active participant, making her thoughts known and expressing her disagreements and concerns with IEP goals. (DE 1 at ¶273). CMS even allowed Plaintiff to bring advocates with her to meetings.

Regarding translation services, there is little case law on this issue. In *H.P.*, cited by Plaintiff, the court denied a motion to dismiss on a claim that a child was denied a FAPE because there was no meaningful parental participation as no translator was provided. *H.P. v. Bd. of Educ. of Chi.*, 385 F. Supp. 3d 623, 637 (N.D. Ill. 2019). However, as the court did not substantively address the issue it provides little guidance in this case. Regardless, this case does not trigger a duty for CMS to provide translation services as Plaintiff has failed to produce evidence showing that Plaintiff could not effectively communicate with the IEP team. In fact, Plaintiff's own Complaint alleges that Plaintiff expressed her concerns and disagreements over the IEP goals with the IEP team, and Plaintiff's summary judgment motion makes clear that Plaintiff effectively communicated her desire for A.C. to remain at Mallard Creek High school. Accordingly, Plaintiff

21

was able to meaningfully participate in the IEP meetings, regardless of whether CMS offered an interpreter.

iv.    <u>Predetermination</u>

Plaintiff's argument that the IEP team's decision to move A.C. to Metro School was predetermined also lacks sufficient evidentiary support.   The predetermination standard is explained in *Nack*.

> Predetermination amounts to a procedural violation of the IDEA.   It can cause substantive harm, and therefore deprive a child of a FAPE, where parents are effectively deprived of meaningful participation in the IEP process.   However, predetermination is not synonymous with preparation. Federal law prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.

*Nack ex rel. Nack v. Orange City Sch. Dist*., 454 F.3d 604, 610 (6th Cir. 2006) (internal quotations and citations omitted).

At the June 1, 2017 IEP meeting where the IEP team decided to move A.C. to Metro School, Plaintiff expressed her concerns against such a move.   The IEP team discussed these concerns with Plaintiff during the multi-hour meeting, as well as the positive impact Metro School could have on A.C.   There was not a consensus within the IEP team on placement, as Plaintiff opposed the move, but it was ultimately decided that moving A.C. to Metro School was the least restrictive environment.

Plaintiff argues that the IEP team's failure to inform Plaintiff of a portfolio process she could initiate to challenge the decision in combination with CMS' data collection on A.C.'s behavior beginning in August 2016 and continuing throughout the school year shows the decision to move A.C. to Metro School was predetermined.   The failure to inform has no bearing on whether

22

the move was predetermined.  And collecting data on A.C. to help tailor the IEP and BIP to her individualized needs is required by law and is at most preparation, not predetermination. Plaintiff's evidence also fails to account for why, if the outcome was predetermined, the meeting turned into a multi-hour affair where the IEP team heard Plaintiff's objections and discussed them with Plaintiff.  Accordingly, the evidence presented does not show the decision to move A.C. to Metro School was predetermined.

### G.    Plaintiff's Request for IEEs

Parents of a child with a disability have the right to obtain an independent educational evaluation of their child at the public expense if the parent disagrees with an evaluation obtained by the public agency.  34 C.F.R. § 300.502(b).  If the parent makes such a request, the school must either (i) file a due process complaint to request a hearing to show that its original evaluation is appropriate or (ii) ensure that an independent educational evaluation is provided at public expense. *Id*.  While there is no controlling authority cited by the Parties, or found by this Court, there is persuasive authority that when an IEE request falls outside the statute of limitations a school district is not required to fund the requested IEE or to file for due process to defend the appropriateness of its assessment.  *T.P. v. Bryan County Sch. Dist.*, 9 F. Supp. 3d 1397, 1401 (S.D. Ga. 2014), *rev'd on other grounds*, 792 F.3d 1284, 1292 (11th Cir. 2015) (applying IDEA's two-year statute of limitations to summarily deny parent's request for IEE at public expense)[5]; *Ottis W. vs. Brazos ISD*, 113 LRP 2098 (SEA TX 2012) (holding that an IEE request outside the one-year statute of limitations was untimely); *Beaumont Indep. Sch. Dist.*, 114 LRP 7471 (SEA TX 2013) (holding that an IEE request outside the one-year statute of limitations was untimely); *Placentia-Yorba Linda Unified Sch. Dist.*, 112 LRP 41903 (SEA CA 2012) (finding that the IEE request was

---

[5] Rather than relying on the statute of limitations, the Eleventh Circuit remanded after finding the IEE request was moot and declined to rule on the statute of limitations issue.

untimely as it was outside the statute of limitations); *Atlanta Pub. Sch.*, 51 IDELR 29 (SEA GA 2008) (holding that an IEE request beyond the two year statute of limitations was untimely); *Letter to Thorne*, 16 IDELR 606 (OSEP Feb. 5, 1990) ("[I]t would not seem unreasonable for the public agency to deny a parent reimbursement for an IEE that was conducted more than two years after the public agency's evaluation.").

Moreover, a plain-language interpretation of the relevant IDEA provisions leads to the conclusion that the statute of limitations applies to a parent's IEE request. The IDEA bars due process complaints for violations that occurred more than two years after "the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows." 20 U.S.C. § 1415(b)(6)(B); 34 C.F.R. § 300.507(a)(2). The Code of Federal Regulations recognizes that the failure to provide an IEE is an action that may be remedied by filing a due process complaint. 34 C.F.R. § 300.507; 34 C.F.R. § 300.503(a). As North Carolina has a one-year statute of limitations, Plaintiff must bring her due process complaint within one year of the evaluations which give rise to her IEE request. NC. Gen. Stat. § 115C-109.6(b).

On December 13, 2016, the IEP team opened a reevaluation process to conduct behavior evaluations. On August 15, 2017, after A.C. was placed at Metro School, Plaintiff requested IEEs in the areas of (1) behavioral, (2) psychological and educational, (3) occupational therapy, (4) speech language, and (5) autism. There were no assessments in these areas within one year of the IEE request date as the previous evaluations in these areas were conducted in 2013-2015. On August 30, 2017, CMS denied Plaintiff's IEE requests and did not request a due process hearing.

Plaintiff argues that since the IEP team opened a reevaluation process to conduct behavior evaluations on December 13, 2016, Plaintiff's five IEE requests on August 15, 2017 were timely and CMS should have either requested a due process hearing or granted the IEEs. Defendant argues that the pertinent date regarding the statute of limitations was the original assessment date, not the reevaluation date. The *Bryan County School District* case is illuminative.

In *Bryan*, the ALJ found that a parent's request for IEEs, which occurred two months after a reevaluation took place, was barred by Georgia's two-year statute of limitations as the request occurred more than two years after the original evaluations were presented to the IEP team. *See Bryan Cnty. Sch. Dist.*, 113 LRP 4536 (January 25, 2013). As in *Bryan*, Plaintiff's IEE requests occurred outside the statute of limitations. A.C.'s original evaluations occurred more than one year before Plaintiff requested IEEs. And Plaintiff has shown no evidence that opening a reevaluation process was sufficient to trigger Plaintiff's IEE request rights.

## H.    Appropriate Related Services

"Related services means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education." NC 1500-2.27; 20 U.S.C. § 1401(26). An IEP includes those related services that "are tailored to the unique needs of a particular child." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (internal quotations omitted). The IDEA guarantees an "appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d 1998). "[T]he furnishing of every special service necessary to maximize each handicapped child's potential is . . . further than Congress intended to go." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 199 (1982).

Plaintiff argues that CMS' failure to provide occupational therapy ("OT") services as listed in the 2016-2017 IEP and failure to provide speech-language services after Plaintiff's witness

25

testified to that need resulted in denial of FAPE as A.C. did not have appropriate related services to benefit from her special education. Defendant argues that CMS notified Plaintiff that A.C. did not require OT and it was only a transcription error why OT was not removed from A.C.'s 2016-2017 IEP; that the ALJ was within her discretion to find CMS' witnesses more credible on the issue of whether A.C. required direct speech-language services; and that Plaintiff failed to show how either service was required for A.C. to access her education and meet her goals and objectives.

A.C.'s IEP from August 2016 through January 2017 of her 9th grade year, which was created during A.C.'s 8th grade year in 2015-2016, listed OT four times per year as a related service. CMS never provided OT services to A.C. during her 9th grade year. Before A.C.'s 9th grade year, at the January 2016 IEP meeting, the IEP team determined that OT services were no longer needed. CMS relayed this information to Plaintiff in a written notice in January 2016 while A.C. was still in 8th grade. Witness testimony from CMS shows that it was human error why the OT services were not removed from A.C.'s IEP for her 9th grade year. Regarding speech-language services, Plaintiff's speech pathology expert testified that A.C. could learn and was in need of direct speech-language services. However, A.C.'s IEP team determined that direct speech-related services were not necessary and classroom instruction was sufficient.

Plaintiff's argument fails to show how the OT and direct speech-language services were required for A.C. to access her education, a critical flaw in proving A.C. was denied a FAPE. Plaintiff presented no evidence that A.C.'s fine motor skills or ambulatory abilities prevented her from accessing her education, such that OT services were required. Likewise, Plaintiff presented no evidence that Plaintiff could not access her education absent direct speech-language services. And the ALJ's credibility determinations which gave more weight to CMS' witnesses regarding the speech-language services issue were proper.

## IV.    CONCLUSION

Applying the mandated deferential standard, summary judgment is granted Defendant where no genuine dispute as to any material fact exists and the movant is entitled to judgment as a matter of law.  The ALJ's decision is  affirmed.

**IT IS, THEREFORE, ORDERED THAT** Defendant's Motion for Summary Judgment, (DE 48), is **GRANTED** and Plaintiff's Motion for Summary Judgment, (DE 46), is **DENIED**.

The Clerk is directed to close this case.

Signed: December 9, 2021

Robert J. Conrad, Jr.
United States District Judge